UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JERRY MOORE                                    CIVIL ACTION

VERSUS                                         NO: 07-2666

JANET A. NAPOLITANO,                           SECTION: R(5)
SECRETARY, DEPARTMENT OF
HOMELAND SECURITY


## ORDER AND REASONS

Before the Court are plaintiff Jerry Moore's motion to set aside and reverse the Merit Systems Protection Board (MSPB) decision on nondiscrimination claims,[1] and defendant Janet A. Napolitano (DHS)'s motion for partial summary judgment on Moore's nondiscrimination claims.[2] For the following reasons, Moore's motion is DENIED. DHS's motion is GRANTED to the extent it seeks a determination that the MSPB decision on Moore's nondiscrimination claims was not arbitrary and capricious, unsupported by substantial evidence, or otherwise not in

_____

[1]    (R. 110.)

[2]    (R. 124.)

accordance with law.


I.    **BACKGROUND**

From approximately November 1988 to August 1995, Jerry Moore

worked for the United States Coast Guard (USCG) in New Orleans,

Louisiana.[3]  USCG terminated Moore's employment in August 1995.

DHS contends that Moore was removed because he was physically

unable to perform the duties of his job, and that his removal

promoted the efficiency of the service.  At issue in this order

is whether the MSPB decision that Moore's removal promoted the

efficiency of the service was arbitrary and capricious,

unsupported by substantial evidence, or otherwise not in

accordance with law.  Moore also has Title VII and ADEA

discrimination claims, which are not before the Court and are not

implicated by this order.


A.    **Moore's Position with the United States Coast Guard**

Moore was hired on November 2, 1988 as a Grade 9 Maintenance

_____

[3]    At the time of the complaint, USCG was under the
jurisdiction of the United States Department of Transportation
(DOT).  USCG is now under the jurisdiction of the Department of
Homeland Security (DHS).  Janet A. Napolitano, the named
defendant, is the current Secretary of DHS.  Unless otherwise
indicated, references to DHS in this order should be interpreted
as references to the defendant.

Mechanic in the Lamp Shop of the Industrial Division of the USCG Support Center in New Orleans.[4] According to his position description, Moore was required to be "in good health, be able to climb towers, carry moderately heavy equipment when making installations in the field and operate forklift equipment."[5] The position description specifically states that Moore "must be qualified to climb coast guard towers up to a height of 300 ft."[6]

On May 22, 1992, Moore injured his back in a non-work-related incident and went on leave for approximately eleven months.[7] As Moore prepared to return to work, a "job analysis form" was drafted that identified the detailed tasks and demands of Moore's position upon his returen.[8] The form states that Moore's position would require, *inter alia*: frequent lifting of items that weigh ten pounds; occasional lifting of items that weigh less than twenty pounds; occasional bending and stooping; occasional pulling and pushing with assistance; continuous

---

[4]    (R. 110-8, Tab 7.)  Unless otherwise indicated, all Tab citations refer to the manual attachment to record document number 110.

[5]    (*Id.*)

[6]    (*Id.*)

[7]    (Tab 5.)

[8]    (Tab 17.)

reaching, and some overhead reaching;[9]  The form also indicates
that Moore could be required to lift power boxes weighing 47
pounds approximately ten times per year and lights weighing
between 30-47 pounds approximately five times per week.[10]  These
heavier items, however, "are not carried long distance, they are
only carried a few feet at a time," and "assistance could be
provided if necessary."[11]  The form additionally specifies that
Moore could be required to climb towers 150-700 feet tall one to
two times per year.[12]  Lastly, the form states that USCG was
"willing to have Mr. Moore return to work in a light duty program
for approximately six to eight weeks as long as the individual
can return to regular duty work after his light duty program."[13]
The proposed light duty program consisted of:  (1) answering the
telephones; (2) performing paperwork; (3) providing technical
support which is basically giving guidance to the other workers;
and (4) performing bench repair work on items that weigh less

---

[9]     (*Id.*)

[10]    (*Id.*)

[11]    (*Id.*)

[12]    (*Id.*)

[13]    (*Id.*)

than 20 pounds.[14]  The form states that Moore's maintenance mechanic position was "really the lightest position available in this particular department; therefore, there is really no way for [USCG] to place [Moore] in another type of position."[15]

On April 16, 1993, Dr. Essam Elmorshidy, Moore's physician, issued a disability certificate certifying Moore for "light work" duties as of April 26, 1993.[16]  The certificate includes restrictions on lifting over 20 pounds and "frequent bending and stooping."[17]  On May 27, 1993, Dr. Edna Doyle, an independent medical examiner, issued a certificate restricting Moore from climbing, except for stairs, and lifting over 50 pounds without assistance.[18]  On June 1, 1993, Doyle concluded that "I do not believe that [Moore] can return to climbing, of course an exception is stairs, and there is no limit to the amount of walking, standing or sitting that he can do.  He can lift up to 50 pounds.  Anything over this he should lift with a coworker."[19]

---

[14]    (*Id.*)

[15]    (*Id.*)

[16]    (Tab 24.)

[17]    (*Id.*)

[18]    (Tab 21.)

[19]    (Tab 22.)

**B.   Moore's Return to Work**

Moore returned to work on April 26, 1993 under a "light duty" designation, although the parties disagree as to the meaning and significance of this designation.  Moore has stated in affidavits that he resumed regular duties after returning to work, with the exception of climbing and repairing towers.[20] Moore asserts that climbing towers was "so infrequent" that "it should have been no problem to assign someone other than me to do this task."[21]  Moore also asserts that he had "never been assigned to climb 300 ft towers" and that "[a]s far as I know, all of the towers under the command are 700 ft towers."[22]  Before his injury, Moore was authorized to climb 700 foot towers, although he could terminate this authorization at his request.[23]  Moore further asserts that he was able to find alternative methods of lifting heavy items, such as by using a dolly, and thus "was able to do my job without undue physical stress."[24]  For its part, DHS has

---

[20]   (Tabs 31, 32, 53, 54.)

[21]   (Tab 54.)

[22]   (*Id.*)

[23]   (Tab 6.)

[24]   (Tab 53.)

6

produced affidavits stating that Moore was unable to perform the full range of his duties after returning to work, including climbing and lifting; that at least some of Moore's work had to be diverted to other departments and employees; and that institutional constraints prevented USCG from reassigning Moore to a lighter duty position.[25]

On October 19, 1994, Moore and a supervisor completed a semiannual progress review.[26] In the "remarks" section of the review, Moore's reviewer wrote that "Moore has been on light duty since his return to work following a job related injury 5/22/92. Due to his physical condition, Mr. Moore cannot perform all required cje's. He is limited in the weights he can handle and is unable to climb. Mr. Moore satisfactorily completed the cje's he was physically able to do."[27] Moore wrote that it was his "understanding that this document list [*sic*] job expectation [*sic*] of employee concerned. Since light duty excludes climbing I contend that 'unable to climb' is non-relative."[28] In the

---

[25]     (*See* Tabs 55, 56; *see also* R. 124-4, vol. 2 at MSPB00310; vol. 3 at MSPB00419; vol. 6 at MSPB00725; vol. 6 at MSPB00737.)

[26]     (Tab 38.)

[27]     (*Id.*)

[28]     (*Id.*)

section concerning "Repairs, overhauls and tests electrical aids to navigation equipment," the review states that "Moore continues to be on a light duty status thus somewhat limiting the jobs he can perform. Because of his condition, Mr. Moore can no longer work aloft thus curtailing his involvement with tower work. However, Mr. Moore performs all other phases of this CJE in a meritorious manner."[29]

Apart from Moore's ability to lift and climb, the parties do not dispute that Moore received positive reviews for the work that he was able to perform. DHS's internal investigation concluded that "[d]ocumentary evidence shows that [Moore] was qualified for his position."[30] One of Moore's supervisors submitted an affidavit stating "emphatically that I did not have any concerns about Mr. Moore's performance of the duties he was assigned. He was rated highly on the light duties he performed after his injury, and he received cash performance awards for the ratings."[31] Moore received a "meritorious rating" and monetary bonus for the annual periods ending March 1994 and March 1995.[32]

---

[29]   (*Id.*)

[30]   (Tab 5 at 5.)

[31]   (R. 43, Ex. A-22 at 7.)

[32]   (Tab 10.)

The 1995 award approval attaches "a brief justification that addresses the employee's high quality performance in each job element. Based on past experience, the employee's outstanding performance is likely to continue."[33]   On April 25, 1995, Moore was commended for his "can-do" attitude and asked to "[k]eep up the outstanding work!"[34]   In May 1995, Moore's "superior performance" on a particular project was commended.[35]

In April 1994, USCG proposed moving Moore's position to the electric shop "to provide [Moore] greater opportunity for promotion in the future."[36]   A new position description had not yet been approved, however, and Moore would remain a grade nine maintenance mechanic.[37]   In April 1995, Moore's revised position description received preliminary approval.[38]   The revised position description was expected to "support an electrician (WG-10) position."[39]   The revised position description is not, however, in

---

[33]   (*Id.*)

[34]   (*Id.*)

[35]   (*Id.*)

[36]   (Tabs 28, 35.)

[37]   (*Id.*)

[38]   (Tab 36.)

[39]   (*Id.*)

the record, and there is no evidence that the duties of Moore's position changed materially. There also is no evidence that the revised position description was ever finally approved.

## C.    Requests for Medical Information

In September 1994, Cdr. Collin S. Campbell, Executive Officer of USCG Integrated Support Command, learned of Moore's back injury.[40] Campbell also learned that Moore had been lifting weights at a USCG facility.[41] In response, Campbell directed Moore not to workout at the USCG facility until he provided further medical documentation.[42] Campbell instructed Lt. Theodore Kozikowski, another of Moore's supervisors, to resolve the issue.[43] On October 17, 1994, Kozikowski informed Moore that "[i]n order to properly assign you work it is imperative that I have an up to date status on your physical condition."[44] Kozikowski ordered Moore to have his physician complete a duty status report.

---

[40]    (Tabs 30, 33, 56.)

[41]    (*Id.*)

[42]    (*Id.*)

[43]    (Tab 56.)

[44]    (Tab 25.)

Moore was evaluated by Dr. Elmorshidy on October 13, 1994. Elmorshidy observed that Moore was "[d]oing considerably better, improving. Has minimal muscle spasms, minimal tenderness."[45] Elmorshidy stated that Moore could carry ten pounds intermittently for two hours per day, should not carry items over ten pounds, and should not climb ladders, kneel, bend, stoop or twist for any number of hours per day. Elmorshidy also stated that Moore could sit intermittently for six hours per day, stand intermittently for three hours per day, walk intermittently for two hours per day, climb stairs intermittently for a half hour per day, and pull and push intermittently for a half hour per day.

Kozikowski requested additional medical information from Moore on February 16, 1995.[46] Kozikowski sought the additional information "[i]n order to properly consider your condition and understand how your condition affects your ability to perform your job."[47] On May 8, 1995, having received no response, Kozikowski directed Moore to attend a fitness for duty

---

[45]   (Tab 26.)

[46]   (R. 124-4, vol. 8 at 260.)

[47]   (*Id.*)

examination with Lcdr. H. Hernandez.[48]  Before the examination

with Hernandez took place, however, a separate examination was

conducted by Dr. Charles L. Johnson, an Orthopedist, on May 23,

1995.[49]  Johnson stated that Moore "needs no other further

treatment for his back injury aside from a continued home

exercise program."[50]  Johnson also stated that Moore's herniated

disc was a "permanent condition which is currently not aggravated

by any conditions at work.  He may perform his normal duties on a

full time basis with the only limitation of no prolonged lifting

over 10-20 lbs. and only short intermittent lifting of up to 50

pounds.  He may climb short heights up to 3-5 steps.  He may

operate forklifts and other heavy equipment."[51]  Johnson concluded

that "there is no need to further limit his activity level."[52]

Yet another examination was conducted by Dr. Elmorshidy on

May 25, 1995.[53]  In his report, Elmorshidy stated that he

"[v]iewed Dr. William Johnson report and I feel that [Moore]

-------------------------------------------------------------

[48]   (Tab 42.)

[49]   (*See* Tab 56 at 4.)

[50]   (Tab 43.)

[51]   (*Id.*)

[52]   (*Id.*)

[53]   (Tab 44.)

should not be able to lift anything over 15 pounds for the next 2 years."[54]   Elmorshidy wrote that Moore should not engage in "frequent bending, climbing and working in unprotected heights."[55]

Finally, Lcdr. Hernandez conducted a case review and patient interview with Moore on June 5, 1995.[56]  Hernandez reviewed the Johnson and Elmorshidy reports and concluded that "[a]s I understand this patient has to be able to perform constant and repetitious bending to be able to perform his job, also is required to lift weight approximate 30-40 lbs, is required to lift horns which weigh 120 lbs, climb towers and a lot of pushing and pulling.  In view of the above, and his attending physician recommends patient need be on those restriction for the next 2 years.  This patient is Not Fit For Full Duty and a possibility of re injury exist [*sic*] if we don't follow Ortho recommendation."[57]

## D.  Moore's Termination

On July 21, 1995, Kozikowski sent Moore a notice of proposed

---

[54]    (*Id.*)

[55]    (*Id.*)

[56]    (Tab 46.)

[57]    (*Id.*)

removal.[58]   The reason for Moore's termination was "to promote the efficiency of the service" based on Moore's "physical inability to fully perform the duties of [his] position."[59] Specifically, the duties Moore was purportedly physically unable to perform included: (1) climbing towers; (2) electric horn repair; (3) wave activated generator repair; (4) 190MM lantern overhaul; (5) range lantern repair; (6) DCB 24" rotating beacon repair; (7) handle and install large controller equipment; (8) repair, install large motors, 1/2 HP and over; (9) install and repair distribution systems and breaker panels; (10) push and pull cable; (11) bend and instal conduit; (12) perform any type of work on floating units; (13) handle and cut lumber for the fabrication of dayboards; (14) fabricate dayboards; (15) assist with pouring concrete sinkers; (16) carry moderately heavy equipment; (17) travel by vessel; and (18) operate rotor hammer drill, ditch witch, conduit benders, and ladders.[60]  Kozikowski also asserted that "[d]uring the last two years, while on light duty, we have had to divert work to other shops, detrimentally

---

[58]   (Tab 47.)

[59]   (*Id.*)

[60]   (*Id.*)

14

impacting on their ability to perform their assigned duties."[61]
Kozikowski stated that USCG was unable "to continue to
accommodate your limitations due to our changing workload and
shrinking personnel resources."[62]  Campbell formally terminated
Moore's employment on August 23, 1995.[63]

## E.   The MSPB Decision

After a lengthy administrative journey, Moore's termination
was ultimately reviewed by MSPB.  On October 5, 2006, a MSPB
administrative law judge found by a preponderance of the evidence
that Moore's termination promoted the efficiency of the service
because Moore was physically unable to perform "the full range of
his duties."[64]  Moore's petition to review the MSPB decision was
denied by the MSPB Board on January 31, 2007.[65]  The final MSPB
decision was upheld by the EEOC on March 23, 2007,[66] and this
appeal followed on April 25, 2007.

---

[61]     (*Id.*)

[62]     (*Id.*)

[63]     (Tabs 51, 52.)

[64]     (Tab 2 at 9.)

[65]     (Tab 3.)

[66]     *See* U.S. Equal Empl. Opp. Comm'n, Pet. No. 0320070052,
2007 WL 956520, at *1 (Mar. 23, 2007).

**F.    Current Procedural Posture**

The Court held a pretrial conference on September 10, 2009. As a result of issues raised at the conference, Moore filed an amended complaint on September 14, 2009.[67]  On December 3, 2009, the Court granted in part and denied in part DHS's partial motion to dismiss the amended complaint on grounds that Moore had not administratively exhausted certain claims.[68]  Specifically, the Court held that Moore failed to exhaust his claims based on failure to promote, failure to train, and obstruction of the administrative process, but that Moore had exhausted his claims based on failure to upgrade, denial of road trip opportunities, and wrongful investigation.

Moore and DHS now seek a determination of whether the MSPB decision that Moore's removal promoted the efficiency of the service was arbitrary and capricious, unsupported by substantial evidence, or otherwise not in accordance with law.

**II.   STANDARD**

**A.    MSPB Appeals**

Ordinarily, appeals from MSPB decisions involving non-

---

[67]    (R. 74.)

[68]    *See Moore v. Napolitano*, Civ. A. No. 07-2666, 2009 WL 4723169 (E.D. La. Dec. 3, 2009).

16

discrimination claims must be brought before the Court of Appeals for the Federal Circuit.[69]  Because the MSPB decision at issue in this case involves both discrimination and non-discrimination claims, however, Moore was required to file this action in federal district court.[70]  Moore is entitled to trial *de novo* on his discrimination claims.[71]  With respect to Moore's nondiscrimination claims, the Court's review is limited to the administrative record, and the Court must uphold the MSPB decision unless it is arbitrary and capricious, unsupported by substantial evidence, or otherwise not in accordance with law.[72]  Substantial evidence is defined as "[t]he degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion even though other reasonable persons might disagree.  This is a lower

---

[69]    *See* 5 U.S.C. § 7703(b)(1).

[70]    *See* 5 U.S.C. §§ 7702(a)(1), (2), 7703(b)(2); 42 U.S.C. § 2000e-16(c); *Blake v. Dept. of Air Force*, 794 F.2d 170, 172 (5th Cir. 1986); *Wiggins v. U.S. Postal Serv.*, 653 F.2d 219, 221-22 (5th Cir. 1981).

[71]    5 U.S.C. § 7703(c).  The current motions do not implicate Moore's discrimination claims.

[72]    5 U.S.C. § 7703(c)(1)-(3); *see also Aldrup v. Caldera*, 274 F.3d 282, 287 (5th Cir. 2001).

standard of proof than preponderance of the evidence."[73]

## B.    Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[74] When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[75]  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[76]

If the dispositive issue is one on which the moving party

---

[73]    5 C.F.R. § 1201.56(c)(1); *Williams v. Roche*, 468 F. Supp. 2d 836, 843 (E.D. La. 2007).

[74]    Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[75]    *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

[76]    *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[77]  The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[78]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[79]  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.[80]  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for

---

[77]   *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991).

[78]   *Id.* at 1265.

[79]   *See Celotex*, 477 U.S. at 325.

[80]   *See id.* at 324.

trial.[81]


## III. DISCUSSION

### A.   Standards Governing Moore's Termination

#### 1.   Removals under Chapter 43 and Chapter 75

Before reviewing the evidentiary basis for the MSPB decision, the Court must first determine the statutory basis for Moore's termination.   There are two possibilities: 5 U.S.C. § 4301, *et seq.* (*i.e.*, a Chapter 43 removal ); or 5 U.S.C. § 7501, *et seq.* (*i.e.*, a Chapter 75 removal).   As the Federal Circuit explained in *Lovshin v. Department of Navy*,[82] different legal standards and procedures apply to removals under each statute.[83]

Under Chapter 43, an agency employee may be terminated only for "unacceptable performance."[84]   Unacceptable performance is not a synonym for "generally poor performance or inefficiency."[85]

---

[81]     *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

[82]     767 F.2d 826 (Fed. Cir. 1985) (*en banc*), *cert. denied*, 475 U.S. 1111 (1986).

[83]     *Id.* at 834 (discussing legislative history and different standards of Chapters 43 and 75).

[84]     5 U.S.C. § 4303(a).

[85]     *Lovshin*, 767 F.2d at 834.

Rather, unacceptable performance is statutorily defined as performance that "fails to meet established requirements in one or more critical elements of the job."[86]  A critical job element is defined by federal regulations as a "work assignment or responsibility of such importance that unacceptable performance on the element would result in a determination that an employee's overall performance is unacceptable."[87]  Agency employees are encouraged to participate in establishing the critical job elements of their positions.[88]  The critical job elements must be communicated to employees at the beginning of each evaluation period.[89]  An agency employee may be terminated for receiving a rating of unacceptable with respect to even a single critical job element.[90]  An agency must prove unacceptable performance by substantial evidence.[91]

A federal agency may also terminate an employee "for such

---

[86]  5 U.S.C. § 4301(3).

[87]  5 C.F.R. § 430.203.

[88]  5 U.S.C. § 4302(a)(2).

[89]  5 U.S.C. § 4302(b)(2).

[90]  *See Lovshin*, 767 F.2d at 834.

[91]  5 U.S.C. § 7701(c)(1).

cause as will promote the efficiency of the service."[92]  The agency must demonstrate a nexus between the cause for the employee's termination and the efficiency of the service.[93]  In addition, the agency must make its case by a preponderance of the evidence, a higher legal standard than the one applicable to Chapter 43 removals.[94]  In a Chapter 75 removal, the agency need not demonstrate that the employee performed unacceptably on a critical job element.[95]  As the Eleventh Circuit recognized in *Hatcher v. Department of the Air Force*,[96] "[c]ertain forms of substandard performance may or may not qualify as 'unacceptable performance' but still be of a type that justifies removal to 'promote the efficiency of the service' under Chapter 75."[97]

2.  <u>The removal in this case</u>

The Court finds that Moore was removed pursuant to Chapter 75.  Moore's notice of removal states that Moore's termination

---

[92]  5 U.S.C. § 7513(a).

[93]  *See Lovshin*, 767 F.2d at 834,

[94]  *See* 5 U.S.C. § 7701(c)(1).

[95]  *See Lovshin*, 767 F.2d at 842.

[96]  705 F.2d 1309 (11th Cir. 1983).

[97]  *Id.* at 1313.

was "being proposed to promote the efficiency of the service."[98]
As discussed above, this standard is required in Chapter 75 but
not Chapter 43 removals.  On appeal, MSPB consistently treated
Moore's termination as a Chapter 75 termination.  MSPB
specifically asserted jurisdiction under Chapter 75.[99]  Consistent
with Chapter 75, MSPB reviewed the basis for Moore's termination
under a "preponderance of the evidence" standard.[100]  Also
consistent with Chapter 75, MSPB expressly found that Moore's
"removal promotes the efficiency of the service with respect to
the agency's ability to accomplish its goal of maintaining and
preparing aids to navigation."[101]  Moreover, MSPB did *not* base its
decision on Moore's inability to perform his critical job
elements, a necessary finding in a Chapter 43 removal.  Instead,
MSPB found that Moore was physically unable to perform "the full
range of his duties."[102]  Again, Chapter 75 may permit removal for
performance that is substandard even if it does not equate with

---

[98]    (Tab 47.)

[99]    (Tab 2 at 2.)

[100]   (*Id.* at 2, 9.)

[101]   (*Id.* at 13.)

[102]   (*Id.* at 9.)

23

"unacceptable performance" under Chapter 43.[103]

Although MSPB's characterization of Moore's removal is not necessarily dispositive of the issue,[104] Moore does not even address the fact that both DHS and MSPB invoked Chapter 75. It is true that Moore argues that the MSPB decision was based on an "incorrect assessment of the critical job elements (CJE) of Jerry Moore's position,"[105] and that this argument appears geared to the Chapter 43 context. Moore may not, however, avoid a Chapter 75 removal simply by making Chapter 43-type arguments. To the extent Moore has actually litigated his removal as a Chapter 43 removal, this strategy was unjustified by the record. The record indicates that Moore was notified of the performance related

---

[103] *See Lovshin*, 767 F.2d at 842; *Hatcher*, 705 F.2d at 1313-14. The court in *Lovshin* reasoned that "[a]n employee sought to be removed under Chapter 43 is entitled to be rated on reasonable standards and to have the specific procedures of Chapter 43 applied in connection with those standards. This protection is the *quid pro quo* for the lesser burdens on the agency under that chapter. However, nothing in the statute or legislative history indicates that an employee should thereby be entitled to his position despite serious performance deficiencies where an agency can meet the heavy burdens of Chapter 75 and can show substantive compliance with merit principles." 767 F.2d at 842.

[104] *See Hanratty v. Fed. Aviation Admin.*, 780 F.2d 33, 34-35 (Fed. Cir. 1985) (finding that MSPB may not conduct removal proceeding under Chapter 43 and then *sua sponte* recharacterize agency's action as Chapter 75 removal after record is closed and evidence presented).

[105] (R. 110 at 7.)

deficiencies for which he was removed, and he was also notified that his removal was "being proposed to promote the efficiency of the service."[106] It does not matter whether Moore's performance related failings also implicated his critical job elements.[107] Moreover, even if there were indications in the record that Moore was removed under Chapter 43, this would not alter the Court's analysis. An agency is not prevented "from bringing a mixed case, for example, relying on Chapter 43 for 'unacceptable performance' in a critical element with an alternative, or additional charge, under Chapter 75 for 'such cause as will promote the efficiency of the service.'"[108] Here, even if DHS did attempt to remove Moore under Chapter 43, this would not negate its alternative basis for removing him under Chapter 75. Lastly, the Court observes that DHS has not been permitted to "circumvent Chapter 43 by charging that an employee should have performed better than the standards communicated to him in

---

[106]    (Tab 47.)

[107]    *See Hatcher*, 705 F.2d at 1314 (finding that "petitioner had more than adequate notice of the performance deficiencies for which his removal was undertaken, regardless of the fact that not all the deficiencies were of a type identified as critical elements").

[108]    *Lovshin*, 767 F.2d at 843.

accordance with Chapter 43."[109]  It was repeatedly communicated to

Moore that his position required climbing and heavy lifting, and

Moore was not held to a higher standard.  And although Moore's

performance may not have risen to the level of "unacceptable

performance" under Chapter 43, DHS was required to satisfy a

higher evidentiary standard under Chapter 75, namely, that

Moore's removal promoted the efficiency of the service by a

preponderance of the evidence.  Thus, DHS did not "circumvent"

Chapter 43 but rather elected to utilize one of two equally valid

standards for making good on the public's "right to an efficient

and effective government."[110]

For the reasons stated, the Court finds that Moore was

removed under the standards applicable to Chapter 75 removals.


**B.    Efficiency of the Service**

Having found that Moore was removed under Chapter 75, the

Court must next determine whether there is substantial evidence

in the record that Moore's removal "would promote the efficiency

of the service."[111]  The Court finds that there is.

---

[109]    *Id.* at 842.

[110]    *Id.* at 832 (citing S. Rep. No. 969, at 4 (1978),
*reprinted in* 1978 U.S.C.C.A.N. 2723, 2726).

[111]    5 U.S.C. § 7513(a).

In *Jackson v. United States Postal Service*,[112] the Fifth
Circuit reviewed a Chapter 75 termination of a postal worker on
grounds that he was unable to meet the physical requirements of
his position, including climbing stairs, lifting weights in
excess of 50 to 60 pounds, and engaging in extensive walking,
standing and bending.[113]  The employee's inability to perform
these duties was supported by a physician's statement.[114]  The
Fifth Circuit held that "[t]he removal of an employee whose
physical condition renders him incapable of performing the duties
of his position is recognized as constituting such cause as will
promote the efficiency of service."[115]

It is undisputed that Moore cannot climb towers, and Moore's
personal physician stated that Moore was significantly limited in
his ability to lift weights over ten to fifteen pounds.  Even Dr.
Johnson's more optimistic prognosis stated that Moore was limited
in his ability to lift over 10-20 pounds, and in any event Dr.
Johnson's restrictions were rejected by Dr. Elmorshidy as too
lenient.  Although Moore disputes whether climbing and lifting

---

[112]    666 F.2d 258 (5th Cir. 1982).

[113]    *Id.* at 259.

[114]    *Id.*

[115]    *Id.*

27

heavy weights were critical job elements, he does not deny, and
the record confirms, that they were duties of his position.
Moreover, although Moore asserts that he was able to find
alternative methods of lifting heavy weights, DHS's affidavits
state that some of Moore's duties had to be reassigned to other
departments, thus burdening those departments and other
employees.  In sum, even if Moore were able to find alternative
methods of lifting weights, there is evidence in the record that
these alternative methods were institutionally inefficient, and
accordingly that Moore's termination promoted the efficiency of
the service.[116]

    The Court emphasizes that this is not the only conclusion to
draw from the record.  But Moore is not entitled to trial *de novo*
on his nondiscrimination claims.  That Moore's termination would
promote the efficiency of the service is not an arbitrary
conclusion, and the Court finds that it is supported by
substantial evidence.

    To the extent Moore had other defenses to DHS's Chapter 75
removal action or other nondiscrimination claims, More has
neither identified nor pointed to evidence supporting those

_____

    [116]    *See Lovshin*, 767 F.2d at 831 ("When incompetent and
inefficient employees are allowed to stay on the work rolls, it
is the dedicated and competent employee who must increase his
workload so that the public may be benefitted.").

claims and defenses in his response to DHS's motion. Moore has therefore failed to demonstrate that the MSPB decision is not supported by law, and he has also failed to satisfy his burden at summary judgment. DHS's motion for summary judgment is therefore GRANTED to the extent it seeks a determination that the MSPB decision on Moore's nondiscrimination claims was not arbitrary and capricious, unsupported by substantial evidence, or otherwise not in accordance with law.

IV. **CONCLUSION**

For the reasons stated, the Court finds that the MSPB decision that Moore's removal promoted the efficiency of the service was not arbitrary and capricious, unsupported by substantial evidence, or otherwise not in accordance with law. Accordingly, Moore's motion to set aside the MSPB decision is DENIED, and DHS's motion is GRANTED.


New Orleans, Louisiana, this 29th day of March, 2010.


_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE