UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JERRY MOORE                              CIVIL ACTION

VERSUS                                   NO: 07-2666

JANET A. NAPOLITANO,                     SECTION: R(5)
SECRETARY, DEPARTMENT OF
HOMELAND SECURITY

**<u>ORDER AND REASONS</u>**

Before the Court is defendant Department of Homeland

Security (DHS)'s motion to dismiss and/or motion for summary

judgment.[1]  For the following reasons, DHS's motion is GRANTED IN

PART and DENIED IN PART.


**I.    BACKGROUND**

From approximately November 1988 to August 1995, Jerry Moore

worked for the United States Coast Guard (USCG) in New Orleans,

---

[1]    (R. 160.)

Louisiana.[2]  USCG terminated Moore's employment in August 1995.

Moore contends that his termination was discriminatory and

retaliatory.  DHS contends that Moore was terminated because he

was physically unable to perform the duties of his job.  At issue

is whether Moore has raised genuine issues of material fact as to

his claims under Title VII and the Rehabilitation Act.


## A.  Moore's Position with the United States Coast Guard

Moore was hired on November 2, 1988 as a grade WG-9

Maintenance Mechanic in the Lamp Shop of the Industrial Division

of the USCG Support Center in New Orleans.[3]  According to his

position description, Moore was required to be "in good health,

be able to climb towers, carry moderately heavy equipment when

making installations in the field and operate forklift

equipment."[4]

On May 22, 1992, Moore injured his back in a non-work-

---

[2]    At the time of the complaint, USCG was under the
jurisdiction of the United States Department of Transportation
(DOT).  USCG is now under the jurisdiction of DHS.  Janet A.
Napolitano, the named defendant, is the current Secretary of DHS.
Unless otherwise indicated, references to DHS in this order
should be interpreted as references to the defendant.

[3]    (R. 110-8, Tab 7.)  Unless otherwise indicated, all Tab
citations refer to the manual attachment to record document
number 110.

[4]    (*Id.*)

2

related incident and went on leave for approximately eleven months.[5]  As Moore prepared to return to work, a "job analysis form" was created to detail the tasks and demands of Moore's position.[6]  The form states that Moore's position would require, *inter alia*:  frequent lifting of items that weigh ten pounds; occasional lifting of items that weigh less than twenty pounds; occasional bending and stooping; occasional pulling and pushing with assistance; continuous reaching, and some overhead reaching.[7]  The form also indicates that Moore could be required to lift power boxes weighing 47 pounds approximately ten times per year and lights weighing between 30-47 pounds approximately five times per week.[8]  These heavier items, however, "are not carried long distance, they are only carried a few feet at a time," and "assistance could be provided if necessary."[9]  The form additionally specifies that Moore could be required to climb towers 150-700 feet tall one to two times per year.[10]  Lastly,

---

[5]  (Tab 5.)

[6]  (Tab 17.)

[7]  (*Id.*)

[8]  (*Id.*)

[9]  (*Id.*)

[10]  (*Id.*)

the form states that USCG was "willing to have Mr. Moore return to work in a light duty program for approximately six to eight weeks as long as the individual can return to regular duty work after his light duty program."[11]  The proposed light duty program consisted of:  answering the telephones; performing paperwork; providing technical support; and performing bench repair work on items that weigh less than 20 pounds.[12]

On April 16, 1993, Dr. Essam Elmorshidy, Moore's physician, issued a disability certificate certifying Moore for "light work" duties as of April 26, 1993.[13]  The certificate includes restrictions on lifting over 20 pounds and "frequent bending and stooping."[14]  On May 27, 1993, Dr. Edna Doyle, an independent medical examiner, issued a certificate restricting Moore from climbing, except for stairs, and lifting over 50 pounds without assistance.[15]  On June 1, 1993, Doyle concluded that "I do not believe that [Moore] can return to climbing, of course an exception is stairs, and there is no limit to the amount of

---

[11]    *(Id.)*

[12]    (*Id.*)

[13]    (Tab 24.)

[14]    (*Id.*)

[15]    (Tab 21.)

walking, standing or sitting that he can do.  He can lift up to
50 pounds.  Anything over this he should lift with a coworker."[16]

## B.    Moore's Return to Work

Moore returned to work on April 26, 1993 under a light duty
designation, although the parties sharply dispute the meaning and
significance of this designation.  Moore has stated in
depositions and affidavits that he resumed regular duties after
returning to work, with the exception of climbing and repairing
towers.[17]  Moore asserts that climbing towers was "so infrequent"
that "it should have been no problem to assign someone other than
me to do this task."[18]  Moore also asserts that he had "never
been assigned to climb 300 ft towers" and that "[a]s far as I
know, all of the towers under the command are 700 ft towers."[19]
There is evidence that Moore was authorized to climb 700 foot
towers, although he could terminate this authorization at his
request.[20]  Moore further asserts that he was able to find

---

[16]    (Tab 22.)

[17]    (Tabs 31, 32, 53, 54.)

[18]    (Tab 54.)

[19]    (*Id.*)

[20]    (Tab 6.)

5

alternative methods of lifting heavy items, such as by using a
dolly, and thus "was able to do my job without undue physical
stress."[21] For its part, DHS has produced affidavits stating
that Moore was unable to perform the full range of his duties
after returning to work, including climbing and lifting; that at
least some of Moore's work had to be diverted to other
departments and employees; and that institutional constraints
prevented USCG from reassigning Moore to a lighter duty
position.[22]

Apart from Moore's ability to lift and climb, the parties do
not dispute that Moore received positive reviews for the work he
was able to perform. DHS's internal investigation concluded that
"[d]ocumentary evidence shows that [Moore] was qualified for his
position."[23] One of Moore's supervisors submitted an affidavit
stating "emphatically that I did not have any concerns about Mr.
Moore's performance of the duties he was assigned."[24] Moore
received a "meritorious rating" and monetary bonus for the annual

---

[21]    (Tab 53.)

[22]    (*See* Tabs 55, 56; *see also* R. 124-4, vol. 2 at
MSPB00310; *id.*, vol. 3 at MSPB00419; *id.*, vol. 6 at MSPB00725,
737.)

[23]    (Tab 5 at 5.)

[24]    (R. 124-4, vol. 6 at MSPB00731.)

periods ending March 1994 and March 1995.[25]  The 1995 award
approval attaches "a brief justification that addresses the
employee's high quality performance in each job element.  Based
on past experience, the employee's outstanding performance is
likely to continue."[26]  On April 25, 1995, Moore was commended
for his "can-do" attitude and asked to "[k]eep up the outstanding
work!"[27]  In May 1995, Moore's "superior performance" on a
particular project was commended.[28]

C.     **The Discrimination Complaint, EEO Negotiations, and a
       Request for Medical Information**

     Moore's employment proceeded uneventfully from April 1993
until June 1994.  In June 1994, Moore and a group of three other
African American employees submitted to the USCG command a list
of grievances identifying alleged instances of race
discrimination.[29]  Negotiations involving the Equal Employment
Office (EEO) were pursued by the group beginning in August

---

[25]     (Tab 10.)

[26]     (*Id.*)

[27]     (*Id.*)

[28]     (*Id.*)

[29]     (Tab 27.)

1994.[30]  Moore asserts that USCG began removing him from previously scheduled road trip opportunities in August 1994.[31]

The group's discrimination concerns were discussed at negotiating sessions on September 7 and October 14, 1994.[32] During the September session, Cdr. Collin S. Campbell, Executive Officer of USCG Integrated Support Command, prohibited Moore from using the USCG workout facility "until [his] medical status [was] resolved."[33]  Moore asserts that Campbell called him a "rabble-rouser."[34]  Campbell instructed Lt. Theodore Kozikowski, another of Moore's supervisors, to "resolve the problem."[35]  On October 17, 1994, Kozikowski informed Moore that "[i]n order to properly assign you work it is imperative that I have an up to date status on your physical condition."[36]  Kozikowski ordered Moore to have his physician complete a duty status report.

Moore was evaluated by Dr. Essam Elmorshidy on October 13,

---

[30]    (Tab 40.)

[31]    (Tabs 29, 53.)

[32]    (Tabs 33, 34.)

[33]    (Tabs 30, 33, 39, 56.)

[34]    (Tab 54; R. 60, Ex. 2 at 206:23-25.)

[35]    (Tabs 39, 56.)

[36]    (Tab 25.)

1994.  Elmorshidy observed that Moore was "[d]oing considerably better, improving.  Has minimal muscle spasms, minimal tenderness."[37]  Elmorshidy stated that Moore could carry ten pounds intermittently for two hours per day, should not carry items over ten pounds, and should not climb ladders, kneel, bend, stoop or twist for any number of hours per day.[38]  Elmorshidy also stated that Moore could sit intermittently for six hours per day, stand intermittently for three hours per day, walk intermittently for two hours per day, climb stairs intermittently for a half hour per day, and pull and push intermittently for a half hour per day.[39]

On November 21, 1994, Campbell proposed changes to the positions of the African American employees who were pursuing race discrimination grievances.[40]  Two of the employees appear to have accepted position upgrades and settled their grievances with USCG.[41]  Campbell proposed moving Moore's position to the electric shop "to provide [Moore] greater opportunity for

---

[37]    (Tab 26.)

[38]    (*Id.*)

[39]    (*Id.*)

[40]    (Tab 35.)

[41]    (R. 124-4, vol. 8 at MSPB01515-16, 1548-51, 1557.)

promotion in the future," but Moore would remain a grade WG-9 maintenance mechanic.[42]  Moore's grievances were not resolved, and the EEO negotiations between Moore and USCG broke down by the end of November 1994.[43]  On December 7, 1994, Moore filed a class action administrative complaint of race discrimination against USCG.[44]

**D.    Further Requests for Medical Information**

On February 16, 1995, Kozikowski sought additional medical information from Moore "[i]n order to properly consider your condition and understand how your condition affects your ability to perform your job."[45]  Moore objected to the request on grounds that it was "nothing more than retaliatory harassment" and requested further EEO negotiations.[46]  These negotiations ultimately broke down, and Moore filed an individual administrative complaint against USCG on April 21, 1995.[47]

---

[42]    (Tabs 35.)

[43]    (Tab 40.)

[44]    (R. 124-4, vol. 8 at MSPB01520.)

[45]    (R. 124-4, vol. 3 at MSPB00464.)

[46]    (Tab 37.)

[47]    (R. 124-4, vol. 8 at MSPB01499.)

On May 8, 1995, Kozikowski directed Moore to attend a mandatory fitness for duty examination with Lcdr. H. Hernandez.[48] Before the examination with Hernandez took place, however, a separate examination was conducted by Dr. Charles L. Johnson, an orthopedist contracted by USCG, on May 23, 1995.[49] Johnson stated that Moore "needs no other further treatment for his back injury aside from a continued home exercise program."[50] Johnson also stated that Moore's herniated disc was a "permanent condition which is currently not aggravated by any conditions at work. He may perform his normal duties on a full time basis with the only limitation of no prolonged lifting over 10-20 lbs. and only short intermittent lifting of up to 50 pounds."[51] Johnson concluded that "there is no need to further limit his activity level."[52]

Yet another examination was conducted by Dr. Essam Elmorshidy on May 25, 1995.[53] In his report, Elmorshidy stated

---

[48] (Tab 42.)

[49] (Tabs 56, 43.)

[50] (Tab 43.)

[51] (*Id.*)

[52] (*Id.*)

[53] (Tab 44.)

that he "[v]iewed Dr. William Johnson report and I feel that [Moore] should not be able to lift anything over 15 pounds for the next 2 years."[54]    Elmorshidy wrote that Moore should not engage in "frequent bending, climbing and working in unprotected heights."[55]

Finally, Lcdr. H. Hernandez conducted a case review and patient interview with Moore on June 5, 1995.[56] Hernandez reviewed the Johnson and Elmorshidy reports and stated that "[a]s I understand this patient has to be able to perform constant and repetitious bending to be able to perform his job, also is required to lift weight approximate 30-40 lbs, is required to lift horns which weigh 120 lbs, climb towers and a lot of pushing and pulling.  In view of the above, and his attending physician recommends patient need be on those restriction for the next 2 years.  This patient is Not Fit For Full Duty and a possibility of re injury exist [*sic*] if we don't follow Ortho recommendation."[57]

---

[54]    (*Id.*)

[55]    (*Id.*)

[56]    (Tab 46.)

[57]    (*Id.*)

## D.   Moore's Termination

On July 21, 1995, Kozikowski sent Moore a notice of proposed removal.[58]  The letter articulated three basic reasons for Moore's termination:  first, Moore was unable to "fully perform the duties of [his] position"; second, Moore's limitations required USCG to "divert work to other shops, detrimentally impacting on their ability to perform their assigned duties"; and third, USCG was unable to continue to accommodate Moore's limitations "due to our changing workload and shrinking personnel resources."[59]  Campbell formally terminated Moore's employment on August 23, 1995.[60]

## E.   The MSPB Decision

After an administrative odyssey, Moore's termination was ultimately reviewed by the Merit Systems Protection Board (MSPB). On October 5, 2006, an administrative law judge found by a preponderance of the evidence that Moore's removal promoted the efficiency of the service because Moore was physically unable to

---

[58]   (Tab 47.)

[59]   (*Id.*)

[60]   (Tabs 51, 52.)

perform "the full range of his duties."[61]  Moore's petition to

review the MSPB decision was denied by the MSPB Board on January

31, 2007.[62]  The final MSPB decision was upheld by the EEOC on

March 23, 2007.[63]  This appeal followed on April 25, 2007.


**F.   Current Procedural Posture**

The Court held a pretrial conference on September 10, 2009.

As a result of issues raised at the conference, Moore filed an

amended complaint on September 14, 2009.[64]  On December 3, 2009,

the Court granted in part and denied in part DHS's partial motion

to dismiss the amended complaint on grounds that Moore had not

administratively exhausted certain claims.[65]  Specifically, the

Court held that Moore failed to exhaust his claims based on

failure to promote, failure to train, and obstruction of the

administrative process, but that Moore had exhausted his claims

based on failure to upgrade, denial of road trip opportunities,

---

[61]     (Tab 2.)

[62]     (Tab 3.)

[63]     U.S. Equal Empl. Opp. Comm'n, Pet. No. 0320070052, 2007
WL 956520, at *1 (Mar. 23, 2007).

[64]     (R. 74.)

[65]     *Moore v. Napolitano*, Civ. A. No. 07-2666, 2009 WL
4723169 (E.D. La. Dec. 3, 2009).

and wrongful investigation.

On March 29, 2010, the Court denied Moore's motion to set aside and reverse the MSPB decision with respect to his nondiscrimination claims.[66]  The Court held that MSPB's conclusion that Moore's termination promoted the efficiency of the service was not arbitrary and capricious, unsupported by substantial evidence, or otherwise not in accordance with law.[67]

DHS now moves to dismiss or alternatively for summary judgment on Moore's discrimination claims under Title VII and the Rehabilitation Act.[68]

## II.  LEGAL STANDARDS

---

[66]  *Moore v. Napolitano*, __F. Supp. 2d__, 2010 WL 1293934, at *8 (E.D. La. 2010).

[67]  *Id.*

[68]  Moore has opposed DHS's motion with a two page memorandum purportedly incorporating "all pleadings, statements of facts, affidavits, memorandums and attachment filed in response and opposition to previous motions to dismiss and for summary judgment filed against him, including but not limited to R. Docs. 44, 50, 51, 54, 60, 77, 94, 110."  (R. 167.)  This technique is unquestionably improper.  *See, e.g.*, *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."); *see also* E.D. La. R. 7.8.1E ("Except with prior permission of the judge, no . . . memorandum . . . opposing a motion shall exceed 25 pages in length, exclusive of exhibits.").

If matters outside the pleadings are presented on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the motion must be treated as one for summary judgment under Rule 56, and all parties must be given a reasonable opportunity to present material pertinent to the motion.[69]  Both Moore and DHS have attached exhibits to their briefs that go beyond the pleadings, and both have had more than a reasonable opportunity to present evidence pertinent to DHS's motion.  This is the third motion for summary judgment in this action and the second filed by DHS. Extensive discovery was conducted and presented during Moore's administrative proceedings, and a nine volume administrative record is before the Court.  Moore has not identified any additional evidence that would be pertinent to DHS's motion. Accordingly, the Court treats DHS's motion as one for summary judgment.

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[70]

---

[69]    Fed. R. Civ. P. 12(d).

[70]    Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[71] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[72]

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'"[73] The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party."[74]

---

[71] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

[72] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[73] *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991).

[74] *Id.* at 1265.

17

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim.[75]  The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists.[76]  The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial.[77]

## III.  DISCUSSION

### A.    Title VII Retaliation

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee who has opposed an employment practice made unlawful by Title VII.[78]  At

---

[75]    *Celotex*, 477 U.S. at 325.

[76]    *Id.* at 324.

[77]    *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075; *Isquith for and on Behalf of Isquith v. Middle South Utils., Inc.*, 847 F.2d 186, 198 (5th Cir. 1988), *cert. denied*, 488 U.S. 926 (1988).

[78]    42 U.S.C. § 2000e-3(a).

this stage in the proceedings,[79] the Court applies the traditional *McDonnell Douglas* burden shifting framework to Moore's retaliation claims.[80] Under this framework, the plaintiff must first establish a *prima facie* case of retaliation. This requires putting forward evidence that: (1) the plaintiff engaged in an activity protected by Title VII; (2) the employer took an adverse employment action against the plaintiff; and (3) a causal connection exists between the protected activity and the adverse employment action.[81] If the plaintiff carries this burden, the burden shifts, and the defendant must respond by producing evidence of a "legitimate, nondiscriminatory reason" for the adverse employment action.[82] Finally, if the defendant produces evidence of a nondiscriminatory reason for the adverse

---

[79] The Court need not and does not decide at this point whether a mixed-motive jury instruction would be appropriate at trial. *See Smith v. Xerox Corp.*, 602 F.3d 320, 333 (5th Cir. 2010) (holding that "if the district court has before it substantial evidence supporting a conclusion that both a legitimate and an illegitimate (*i.e.*, more than one) motive may have played a role in the challenged employment action, the court may give a mixed-motive instruction.").

[80] *McDonnell Douglas v. Green*, 411 U.S. 792, 802-03 (1973).

[81] *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 484 (5th Cir. 2008).

[82] *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001).

employment action, any "presumption of discrimination vanishes,"
and the burden shifts back to the plaintiff to establish that
"the legitimate reasons offered by the defendant were not its
true reasons, but were a pretext for discrimination."[83]

1. Moore has established a *prima facie* case of
   retaliation.

(a) *Protected activities*

An employee engages in activity protected by Title VII if he
opposes any employment practice made unlawful by Title VII, or if
he participates in any manner in a proceeding under Title VII.[84]
Moore has demonstrated that he engaged in protected activity. In
June 1994, Moore and a group of other African American employees
delivered to USCG supervisors a list of grievances identifying
alleged instances of race discrimination. EEO negotiations were
pursued by the group beginning in August 1994, and the group's
concerns were addressed at negotiating sessions in September and
October 1994. Moore filed a formal administrative charge of
discrimination in December 1994. Moore requested additional EEO

---

[83]    *Id.*

[84]    42 U.S.C. § 2000e-3; *Grimes v. Tex. Dep't of Mental
Health and Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996).

negotiations in February 1995, and he filed a second administrative charge of discrimination in April 1995. Moore pursued these administrative charges until, and after, he was terminated in August 1995. These actions are all protected by Title VII, and USCG does not contend otherwise.

(b) *Materially adverse employment actions*

Moore must demonstrate that USCG took an "adverse employment action" against him.[85] In the retaliation context, a plaintiff must show that a reasonable employee would have found the challenged employment action "materially adverse."[86] An employment action is materially adverse if it is "likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers."[87] An employment action is not materially adverse if it amounts to only "petty slights or minor annoyances that often take place at work and that all employees experience."[88] The significance of a retaliatory act depends on

---

[85]    *Aryain*, 534 F.3d at 484.

[86]    *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *see also McCoy v. City of Shreveport*, 492 F.3d 551, 560 (5th Cir. 2007).

[87]    *Burlington*, 548 U.S. at 68.

[88]    *Id.*

the "particular circumstances" of the case, and "[c]ontext
matters."[89] The Court's inquiry is objective[90] and does not turn
on an employee's "asserted imperviousness to acts of
retaliation."[91]

A reasonable jury could find that there were several
materially adverse employment actions in this case. First,
Moore's termination in August 1995 was a materially adverse
employment action, and USCG does not and could not contend
otherwise.[92]

Second, a reasonable jury could find that withholding
Moore's position upgrade was a materially adverse employment
action. The record supports the inference that Moore's position
warranted a WG-10 classification. On July 12, 1994, an internal
USCG document specifically recommended that Moore's position
description be rewritten from WG-9 to WG-10.[93] The USCG Command
in Portsmouth, Virginia also concluded that Moore's duties

---

[89]    *Id.* at 69.

[90]    *Burlington*, 548 U.S. at 68-69.

[91]    *Steele v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008).

[92]    *See, e.g., Pegram v. Honeywell, Inc.*, 361 F.3d 272,
282-83 (5th Cir. 2004) (stating that "it is beyond dispute that a
termination constitutes an adverse action").

[93]    (R. 124-4, vol. 8 at MSPB01558; *see also* Tabs 36, 39.)

supported a WG-10 position.[94]  Nonetheless, in November 1994,

after offering position upgrades to two other African American

employees pursuing race discrimination grievances,[95] USCG appears

to have withheld the "promised" upgrade to which Moore was

entitled.[96]  A reasonable jury could conclude that withholding a

promised upgrade at the height of EEO negotiations is likely to

deter a reasonable employee from pursuing complaints of

discrimination.

Third, a reasonable jury could find that removing Moore from

previously scheduled road trip opportunities was a materially

adverse employment action.[97]  Moore has submitted an affidavit

stating that "USCG started canceling scheduled road trips I had

during the informal EEO process of my complaint,"[98] and this

assertion is supported by contemporaneous records.[99]  Moore also

---

[94]    (Tab 36.)

[95]    (Tab 35; R. 124-4, vol. 8 at MSPB01515-16, 1557; Tab 35.)

[96]    (Tab 37; *see also* Tab 35.)

[97]    *See, e.g.*, *Montgomery v. Chertoff*, Civ. A. No. 03-5387, 2007 WL 1233551, at *18 (E.D.N.Y. 2007) (finding that losing ability to work overtime hours constitutes materially adverse employment action).

[98]    (Tab 53.)

[99]    (Tab 29.)

asserts that "road trips especially" involved opportunities of overtime pay,[100] and USCG records confirm that "[m]ost of the overtime worked by [USCG] employees is generated by work orders which require our employees to travel to distant sites."[101]   A reasonable jury could conclude that the cancellation of lucrative opportunities for overtime pay during EEO negotiations is likely to deter a reasonable employee from pursuing complaints of discrimination.

Fourth, Moore asserts that USCG retaliated against him by requesting medical information and ordering him to attend a mandatory fitness for duty examination.   In most cases, a reasonably necessary request for medical information is not considered a materially adverse employment action.[102]   On the

---

[100]   (R. 27.)

[101]   (Tab 33; *see also* Tabs 27, 29.)

[102]   *See, e.g.*, 29 U.S.C. § 794(d); 42 U.S.C. § 12112(d)(4)(A), (B) (providing that employer may require medical examination if job-related and consistent with business necessity); *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998) (applying pre-*Burlington* law, and finding that fitness for duty referral "not an adverse employment action" because it was only "designed to gather facts to form the basis for an employment decision."); *Wells v. Gates*, 336 F. App'x 378, 383-84 (4th Cir. 2009) (finding that "reasonable" request for medical documentation, "standing alone," was not materially adverse employment action because request "did not impose any disciplinary action" "or otherwise have a tangible employment consequence"); *Semsroth v. City of Wichita*, 555 F.3d 1182, 1187 (10th Cir. 2009) ("The voluntary nature of the appointment with

unique facts of this case, however, a reasonable jury could

conclude that USCG's repeated requests for medical information

and a mandatory fitness for duty examination were materially

adverse.[103]  The peculiar timing of USCG's initial requests for

medical information – during the September 1994 EEO negotiating

session and three days after the October 1994 session –

reasonably suggests an effort to deter Moore from pursuing those

EEO negotiations.[104]  Moore anticipated early on that USCG's

requests for medical information "indicat[ed] an effort to remove

me from my present job,"[105] and they were in fact part and parcel

---

Dr. Bowman drains the incident of any material adversity that a
mandatory fitness-for-duty test might present.").

[103]  *See Flynn v. N.Y. State Div. of Parole*, 620 F. Supp. 2d
463, 495-96 (S.D.N.Y. 2009) (finding that requiring fitness for
duty examination less than one month after employee engaged in
protected activity constitutes adverse employment action);
*Richard v. Postal Serv.*, 219 F. Supp. 2d 172, 181 (D.N.H. 2002)
(holding that pattern of harassing conduct including numerous
requests for medical documentation constitutes adverse employment
action).

[104]  *Cf. Wishkin v. Potter*, 476 F.3d 180, 187 (3d Cir. 2007)
("The unusual circumstances surrounding the fitness for duty
examinations of all the disabled employees and the consistent and
routine warnings given to the disabled employees regarding their
job status could support Wishkin's contention that the adverse
employment action in question was motivated by discrimination.").

[105]  (Tab 37; *see also* Tab 45 ("It was evident that the
request for medical information was not related to job
performance or duties . . . . The request for medical information
was the first step they took in trying to remove me from my
job.").)

of USCG's ultimate decision to terminate him.[106]  Although a
reasonable request for medical information standing alone may not
be materially adverse, the request becomes materially adverse
when, taken in context, it is "likely to deter victims of
discrimination from complaining to the EEOC."[107]  In this case,
USCG's repeated requests for medical information began during EEO
negotiations, they signaled an effort by USCG to terminate
Moore's employment, and they were in fact used by USCG to justify
Moore's termination.  A reasonable jury could conclude that the
requests, taken in context, were likely to deter a reasonable
employee from pursuing complaints of discrimination.

Finally, the Court finds that two actions by USCG were not
materially adverse employment actions.  First, Moore contends
that USCG retaliated against him by prohibiting him from using
the USCG workout facility.  Moore asserts that he used the
facility "because it was convenient."[108]  A materially adverse
employment action, however, must be "more disruptive than a mere
inconvenience."[109]  A reasonable jury could not conclude that

---

[106]    (Tab 47.)

[107]    *Burlington*, 548 U.S. at 68.

[108]    (Tab 54.)

[109]    *Hobbs v. City of Chicago*, 573 F.3d 454, 463 (7th Cir.
2009); *see also Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir.

restricting Moore's access to a "convenient" workout facility was likely to deter him from pursuing complaints of discrimination. Second, Moore contends that DHS retaliated against him by wrongfully initiating an undercover criminal investigation into his receipt of workers' compensation benefits. Title VII protects former employees from post-employment retaliatory actions by their former employers.[110] Otherwise, an employer would "be able to retaliate with impunity against an entire class of acts under Title VII - for example, complaints regarding discriminatory termination."[111] Nonetheless, Moore has pointed to no evidence in the record, and the Court has found none, indicating that USCG, DOT or DHS initiated the investigation into Moore's receipt of workers' compensation benefits. To the contrary, the record indicates that the Department of Labor (DOL) and not DHS initiated the investigation.[112] Because there is no

---

2009) (holding that minor inconveniences do not rise to level of adverse action necessary to support a retaliation claim).

[110]  *See, e.g.*, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 339 (1997); *Ikossi-Anastasiou v. Bd. of Supervisors of La. State*, 579 F.3d 546, 551 (5th Cir. 2009).

[111]  *Id.* at 346; *see also Burlington*, 548 U.S. at 63-64 (observing that filing false criminal charges against former employee is actionable retaliation).

[112]  (R. 124-4, vol. 8 at MSPB01567-1577; *id.*, vol. 6 at MSPB00747.)

evidence that DHS initiated the investigation, a reasonable jury could not conclude that the investigation was an adverse employment action by DHS against Moore.

For the reasons stated, Moore has satisfied his *prima facie* burden of demonstrating that USCG engaged in the following materially adverse employment actions:  terminating Moore; withholding his position upgrade; cancelling his road trip opportunities; and repeatedly requesting medical information and a fitness for duty examination from him.  Moore has not satisfied his *prima facie* burden of demonstrating that the restriction on his use of the USCG workout room and DOL's investigation into his receipt of workers' compensation benefits were materially adverse employment actions, and DHS's motion for summary judgment is GRANTED with respect to these claims.

(c)  *Prima facie causation.*

DHS asserts that Moore has not demonstrated a causal connection between his protected activities and its adverse employment actions.  At least for purposes of Moore's *prima facie* case, causation may be inferred from a close temporal proximity between a protected activity and an adverse employment action.[113]

---

[113]  *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

The events giving rise to the retaliation claim, however, must not be too attenuated from the adverse employment action.[114]

Moore has presented sufficient evidence to establish *prima facie* causation. USCG did not raise any concerns about Moore's performance for over a year after his return to work in April 1993. After June 1994, however, USCG engaged in a series of escalating adverse employment actions. In August 1994, during informal negotiations with Moore, USCG removed Moore from at least one previously scheduled road trip opportunity. In September and October 1994, while Moore was actively pursuing EEO negotiations, USCG began demanding medical information. In November 1994, as EEO negotiations reached a climax, USCG withheld Moore's position upgrade. In February 1995, after Moore filed his first administrative discrimination charge, USCG requested further medical information. In April 1995, shortly after Moore filed his second administrative discrimination complaint, USCG ordered Moore to attend a mandatory fitness for

---

[114] *See, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'"); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002) (finding five-month period between protected activity and adverse employment action insufficient to establish *prima facie* retaliation claim).

duty examination.  Based on the results of the ensuing

examinations, USCG sent Moore a notice of proposed termination in

July 1995 and terminated his employment in August 1995.  Taken

together, this repeated sequence of protected activity followed

by adverse employment action is sufficient to establish a *prima*

*facie* case of retaliation under Title VII.


    2.    DHS has produced evidence of a legitimate,

          nondiscriminatory reason for its adverse employment

          actions.

    Because Moore has established a *prima facie* case of

retaliation, the burden shifts and DHS must respond by producing

evidence of a "legitimate, nondiscriminatory reason" for its

adverse employment actions.[115]  DHS has satisfied this burden.

    A reasonable jury could conclude that DHS terminated Moore

because he was physically unable to perform the elements of his

position.  In Moore's termination letter, USCG listed over

eighteen different aspects of Moore's position that he was

allegedly unable to perform as a result of his back injury.[116]

USCG's assertions are supported by Dr. Essam Elmorshidy's medical

_____

    [115]    *Okoye*, 245 F.3d at 512.

    [116]    (Tab 47.)

report dated May 25, 1995, which states that Moore "should not be able to lift anything over 15 pounds for the next 2 years" and should not engage in "frequent bending, climbing and working in unprotected heights."[117]  According to USCG, Moore's limitations required it "to divert work to other shops, detrimentally impacting on their ability to perform their assigned duties," and USCG could no longer accommodate Moore's limitations "due to [its] changing workload and shrinking personnel resources."[118]  A reasonable jury could find that these explanations for Moore's termination were legitimate and nondiscriminatory.[119]

3. <u>Moore has presented evidence that DHS's explanations are pretextual.</u>

---

[117]  (Tab 44.)

[118]  (Tab 47.)

[119]  *See, e.g.*, *Chiari v. City of League City*, 920 F.2d 311, 316 (5th Cir. 1991) (fears about employee's safety constitutes legitimate, nondiscriminatory reason for discharge); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1087-88 (5th Cir. 1994) (unsatisfactory physical condition constitutes legitimate, nondiscriminatory reason for discharge); *Martin v. Bayland*, 181 F. App'x 422, 424 (5th Cir. 2006) (inability to safely perform job constitutes legitimate, nondiscriminatory reason for discharge); *Equal Empl. Opp. Comm'n v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996) (reduction in workforce constitutes legitimate, nondiscriminatory reason for discharge); *Samford v. Stolle Corp.*, 181 F.3d 96, at *2 (5th Cir. 1999) (*per curiam*) (reorganization of maintenance department constitutes legitimate, nondiscriminatory reason for discharge).

Because USCG has produced evidence of a legitimate, nondiscriminatory reason for Moore's termination, the burden shifts back to Moore to present evidence that "the legitimate reasons offered by [USCG] were not its true reasons, but were a pretext for discrimination."[120]  To meet this burden, Moore must establish that he would not have been subject to an adverse employment action "but for" his protected activities.[121]  In the Fifth Circuit, it is clear that "temporal proximity alone" is insufficient to establish the necessary causation.[122]

As already discussed, Moore has demonstrated a close temporal proximity between his protected activities and USCG's adverse employment actions.  The Court further finds that Moore has presented sufficient additional evidence for a reasonable jury to conclude that USCG's legitimate explanations for Moore's termination were pretextual.

First, a reasonable jury could conclude that USCG would not have raised concerns about Moore's performance but for Moore's

---

[120]   *Okoye*, 245 F.3d at 512; *Septimus v. Univ. of Houston*, 399 F.3d 601, 607 (5th Cir. 2005).

[121]   *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 685 (5th Cir. 2001); *Strong*, 482 F.3d at 806.

[122]   *Strong*, 482 F.3d at 808; *compare Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 43 (5th Cir. 1992) (finding that temporal proximity and high performance reviews immediately prior to termination were sufficient to demonstrate pretext).

protected activities.  There is no evidence that USCG raised

concerns about Moore's performance during the 13 months before he

submitted his list of grievances in June 1994.  For his part,

Moore has submitted an affidavit stating that "[n]one of my

immediate supervisors ever suggested to me that I was not

performing all essential aspects of my job.  There were no issues

raised concerning my job performance before the extraordinary

demand that I submit to a medical examination."[123]  That USCG did

not raise concerns about Moore's performance for over a year

after he returned to work suggests that USCG did not in fact have

such concerns.[124]  This inference is supported by the fact that

USCG internally requested "the latest on Mr. Moore's medical

condition" only on September 6, 1994 – the day before the EEO

negotiating session on September 7, 1994.[125]

    Second, a reasonable jury could discredit USCG's list of

purported job duties that Moore allegedly was unable to

perform.[126]  The job analysis form prepared shortly before Moore's

---

[123]   (Tab 54.)

[124]   *See Medina*, 238 F.3d at 685 (finding evidence that
employee's work evaluations changed dramatically after plaintiff
began complaining about age discrimination raised triable issue
of fact as to Title VII retaliation)

[125]   (Tab 18.)

[126]   (Tab 47.)

return to work in April 1993 does not identify most of these purported duties,[127] and Moore has submitted an affidavit stating that "[t]here were no essential functions of my job that I did not do."[128]  Even if USCG's list correctly identified Moore's actual duties, Moore asserts that he was able to find alternative methods of completing them, such as by using a dolly, and thus "was able to do my job without undue physical stress."[129]  Moore's assertion is supported by his job analysis form, which states that Moore would need to lift items weighing ten to twenty pounds only "occasionally," and that Moore would have "help or assistance" with items weighing over twenty pounds.[130]  Indeed, the job analysis form directly contradicts USCG's assertion that "on any given day [Moore] would be required to lift over 15 pounds - continuously, throughout the day."[131]  The medical report of Dr. Charles Johnson dated May 23, 1995, which was not discussed in Moore's notice of proposed termination, further undermines USCG's assertion that Moore was unable to perform the

---

[127]    (Tab 17.)

[128]    (Tab 54.)

[129]    (Tab 53; *see also* Tab 31.)

[130]    (Tab 17.)

[131]    (Tab 47.)

duties of his job. Johnson concluded that Moore needed "no other further treatment for his back injury aside from a continued home exercise program," and that "there is no need to further limit his activity level."[132] Although Johnson stated that Moore could not engage in "prolonged lifting over 10-20 lbs. and only short intermittent lifting of up to 50 pounds,"[133] a reasonable jury could conclude that this restriction was irrelevant to the actual duties of Moore's job. Moreover, although it is true that Moore was unable to climb high towers, Moore asserts that he had "never been assigned to climb 300 ft towers," and that the duty to climb 700 ft towers "was so infrequent . . . it should have been no problem to assign someone other than me to do this task."[134] According to Moore, "USCG does not require employees to climb towers. It was not mandatory. It was explained to me that it was a voluntary thing."[135] Moore's assertions are again supported by his job analysis form, which states that climbing towers "is only done one to two times a year."[136] Moore's assertions are

---

[132]     (Tab 43.)

[133]     (*Id.*)

[134]     (Tab 54.)

[135]     (Tab 53.)

[136]     (Tab 17.)

also supported by his apparent ability to terminate his authorization to climb 700 foot towers upon request.[137]   Lastly, although Moore's commanding officer, John Murphy, stated that "climbing towers was the main issue regarding Mr. Moore's fitness for duty,"[138] Collin Campbell asserted that climbing "was not the main issue."[139]   That two of Moore's supervisors had directly contradictory views about Moore's job performance suggests that job performance was not the true reason for his termination.   In sum, if a jury finds that Moore was able to perform the actual duties of his position, it could also conclude that USCG's explanation for his termination was pretextual.

Third, a reasonable jury could conclude that Moore was not terminated as a result of institutional constraints at USCG. Although the record indicates that USCG may have been undertaking a local reorganization in the fall of 1994, USCG said that it was offering Moore "greater opportunity for promotion" in connection with this reorganization.[140]   In an affidavit, Campbell attempts to link Moore's termination to a "Coast Guard-wide"

---

[137]   (Tab 6.)

[138]   (Tab 55.)

[139]   (Tab 56.)

[140]   (Tab 35.)

reorganization conducted by USCG headquarters from 1994 through 1996.[141] This reorganization was not mentioned in Moore's notice of proposed termination, however, and the affidavits of John Murphy,[142] the commanding officer of USCG in June 1995, and Theodore Diecidue,[143] Moore's general supervisor, do not assert that an institutional reorganization was a reason for Moore's termination. Moreover, Campbell acknowledges that he became "aware generally of the headquarter's concept to implement the major reorganization into the ISC concept in late 1994,"[144] and the affidavit of Gail Brule states that "[i]t was not until 1996 that the actual streamlining took place."[145] A reasonable jury could conclude that a reorganization that took place in 1996 does not justify USCG's adverse employment actions that allegedly began in the summer of 1994. Finally, although Campbell asserts that the reorganization ultimately "resulted in the Coast Guard losing approximately 2000 military billets and civilian positions," he does not assert that Moore's position was directly

---

[141] (R. 124-4, vol. 6 at MSPB00727-29.)

[142] (Tab 55.)

[143] (R. 124-4, vol. 3 at MSPB00419-21.)

[144] (*Id.*)

[145] (*Id.*, vol. 3 at MSPB00427; *see also id.*, vol.6 at MSPB00744.)

affected by the reorganization.  Campbell instead asserts that

Moore was terminated because "we needed every person to be able

to fulfill their duties, and had no ability to continue anyone in

a 'light duty' status."[146]  But as already discussed, a reasonable

jury could conclude that Moore was performing the duties of his

job and was not in fact in a light duty status.

For all of these reasons, in addition to the temporal

proximity between Moore's protected activities and USCG's adverse

employment actions, a reasonable jury could find that USCG's

explanations for Moore's termination were pretextual.  DHS's

motion for summary judgment is DENIED with respect to Moore's

Title VII retaliation claims.


**B.    Title VII Disparate Treatment**

A disparate treatment claim addresses employment actions

that treat one employee worse than others based on the employee's

race or color.[147]  To demonstrate a *prima facie* disparate

treatment claim, a plaintiff must show that he:  (1) is a member

of a protected group; (2) was qualified for the position at

issue; (3) was discharged or suffered some adverse employment

---

[146]    (R. 124-4, vol. 6 at MSPB00729.)

[147]    *Pacheco v. Mineta*, 448 F.3d 783, 788 (5th Cir. 2006).

38

action; and (4) was replaced by someone outside his protected group, or was treated less favorably than other similarly situated employees outside the protected group.[148]  In the disparate treatment context, only "ultimate employment decisions" are actionable adverse employment actions.[149]  Ultimate employment decisions include events such as "hiring, granting leave, discharging, promoting, and compensating."[150]  Furthermore, an "individual plaintiff claiming disparate treatment in pay under Title VII must show that his circumstances are 'nearly identical' to those of a better-paid employee who is not a member of the protected class."[151]  In this case, Moore is a member of a protected group, and the Court has already found that a reasonable jury could conclude that Moore was able to perform the duties of his position.  There are only two ultimate employment decisions at issue in this case:  withholding Moore's position upgrade and terminating Moore's employment.[152]  Thus, the issues

---

[148]    *McCoy*, 492 F.3d at 556.

[149]    *Id.* at 559-60.

[150]    *Hernandez v. Crawford Bldg. Material Co.*, 321 F.3d 528, 531 (5th Cir. 2003); *see also id.* at 532 n.2 (collecting cases).

[151]    *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 523 (5th Cir. 2008).

[152]    *Pegram v. Honeywell*, 361 F.3d 272, 282-83 (5th Cir. 2004) (finding that termination is ultimate employment decision);

are whether Moore's pay grade classification was less favorable than the classifications of other similarly situated white employees, and whether Moore was replaced by a similarly situated white employee after his termination.

Moore has not pointed to evidence that he was replaced by a similarly situated white employee after his termination. Nor has Moore pointed to any evidence that his pay grade classification was lower than "*specific*" white employees.[153] The administrative record does include a list identifying the race and compensation of various USCG employees in 1997,[154] but this list establishes nothing because Moore has not identified the white employees whose situations should be considered "nearly identical" to his own.[155] Although Moore contends in his affidavit that he was "clearly the victim[] of discriminatory pay grades and job duties,"[156] this conclusory assertion is insufficient to carry his

---

*Thomas v. Tex. Dep't of Crim. Justice*, 220 F.3d 389, 394 (5th Cir. 2000) (finding that denial of promotion is ultimate employment decision).

[153]    *Taylor*, 554 F.3d at 523.

[154]    (R. 124-4, vol. 3 at MSPB00407-410.)

[155]    *Taylor*, 554 F.3d at 523.

[156]    (Tab 45.)

burden at summary judgment.[157]  Because Moore has not put forward

evidence that he was treated less favorably than specific

similarly situated white employees, DHS's motion for summary

judgment is GRANTED with respect to Moore's disparate treatment

claims.


**C.   Rehabilitation Act**

The Rehabilitation Act of 1973 prohibits employment

discrimination against a "qualified individual . . . solely by

reason of her or his disability."[158]  The Fifth Circuit has

summarized that to qualify for relief under the Rehabilitation

Act, a plaintiff must prove that he:  (1) is an "individual with

a disability"; (2) is "otherwise qualified" for the job; (3)

worked for a federal employer; and (4) suffered discrimination

"solely by reason of her or his disability."[159]  Because Moore is

not an individual with a disability, the Court need not address

the other three prongs.

---

[157]     *Galindo*, 754 F.2d at 1216 (stating that "unsupported
allegations or affidavits setting forth 'ultimate or conclusory
facts and conclusions of law' are insufficient to either support
or defeat a motion for summary judgment").

[158]     29 U.S.C. § 794(a).

[159]     *Hileman v. Dallas*, 115 F.3d 352, 353 (5th Cir. 1997).

1.   <u>Applicable Law</u>

Currently, the terms "disability" and "individual with a disability" under the Rehabilitation Act are defined by reference to the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102.[160]  Section 12102 provides that an individual has a "disability" if he (a) has "a physical or mental impairment that substantially limits one or more major life activities of such individual"; (b) has a "record of such an impairment"; or (c) is "regarded as having such an impairment."[161]  Section 12102 further specifies that an individual is "regarded as having such an impairment" if he has been subjected to a prohibited action "because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit major life activity*."[162]  Moore contends that USCG terminated his employment because it perceived him as having a back injury, and therefore he is an individual with a disability within the meaning of the Rehabilitation Act.

The current definitions of "an individual with a disability" under the Rehabilitation Act and the ADA were enacted by

---

[160]   29 U.S.C. § 705(9)(B), (20)(B) (2009).

[161]   42 U.S.C. § 12102(1)(A)-(C).

[162]   42 U.S.C. § 12102(3)(A) (emphasis added).

amendment in 2008.[163]  The 2008 amendments do not apply

retroactively.[164]  Before 2008, and at the time Moore was

terminated, the definition of an individual with a disability

under the Rehabilitation Act did not include the specification

that an individual may be regarded as having an impairment

"whether or not the impairment limits or is perceived to limit

major life activity."[165]  The pre-2008 definition was interpreted

by the Supreme Court in *Sutton v. United Air Lines*,[166] which held,

in contrast to the current definition, that an employer acts

unlawfully only "when it makes an employment decision based on a

physical or mental impairment, real or imagined, that is regarded

---

[163]     *See* Pub. L. 110-325, §§ 4(a), 7(1), 7(2) (Sept. 25, 2008).

[164]     *See, e.g.*, Pub. L. 110-325, § 8 (providing that the 2008 amendments "shall become effective on January 1, 2009"); *Kemp v. Holder*, __F.3d__, 2010 WL 2510133, at *3 (5th Cir. 2010) (finding that 2008 amendments to Rehabilitation Act do not apply retroactively and applying *Sutton*); *Equal Empl. Opp. Comm'n v. Agro Dist., LLC*, 555 F.3d 462, 468 n.8 (5th Cir. 2009) (same); *Lytes v. DC Water & Sewer Auth.*, 572 F.3d 936, 940 (D.C. Cir. 2009); *Becerril v. Pima County Assessor's Office*, 587 F.3d 1162, 1164 (9th Cir. 2009); *Kania v. Potter*, 358 F. App'x 338, 341 n.5 (3d Cir. 2009); *Fredricksen v. United Parcel Serv.*, 581 F.3d 516, 521 n.1 (7th Cir. 2009);  *Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 565-67 (6th Cir. 2009).

[165]     29 U.S.C. § 705(9)(B), (20)(B) (2007).

[166]     *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999).

as substantially limiting a major life activity."[167]  Thus, under

*Sutton*, an employer "is free to decide that some limiting, but

not substantially limiting, impairments make individuals less

than ideally suited for a job."[168]  The focus in *Sutton* is on

whether the impairment, imagined or real, is perceived by the

employer as substantially limiting.[169]

The pre-2008 definition of an individual with a disability

was again interpreted by the Supreme Court in *Toyota Motor*

*Manufacturing v. Williams*.[170]  In *Toyota*, the Supreme Court held

that to be substantially limited in a major life activity, "an

individual must have an impairment that prevents or severely

restricts the individual from doing activities that are of

central importance to most people's daily lives.  The

---

[167]  *Id.* at 490 (interpreting definition of "disability" under ADA, but observing that ADA definition "drawn 'almost verbatim' from the Rehabilitation Act")).

[168]  *Id.* at 490-91.

[169]  *Id.* at 489 ("There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.")

[170]  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002).

impairment's impact must also be permanent or long term."[171]  The

Supreme Court reasoned that "these terms need to be interpreted

strictly to create a demanding standard for qualifying as

disabled."[172]


    2.  <u>Analysis</u>

    Under *Sutton* and *Toyota*, Moore must demonstrate that USCG

regarded him as having a physical or mental impairment that

substantially limited one or more of his major life activities.[173]

Federal regulations define "[m]ajor life activities" as

"functions such as caring for one's self, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning,

and working."[174]  Moore asserts that USCG perceived him as

---

    [171]   *Id.* at 198.

    [172]   *Id.* at 197.

    [173]   29 U.S.C. § 705(20)(B) (2007); *see also Sutton*, 527
U.S. at 490.

    [174]   45 C.F.R. § 84.3(j)(2)(ii); *cf.* 42 U.S.C. § 12102(2)
(2009) (same).  The Court observes that courts have generally
interpreted the ADA and the Rehabilitation Act, as well as their
implementing regulations, interchangeably. *See, e.g.*, *Toyota*, 534
U.S. at 193-94 (observing that "Congress drew the ADA's
definition of disability almost verbatim from the definition of
'handicapped individual' in the Rehabilitation Act, § 706(8)(B),
and Congress' repetition of a well-established term generally
implies that Congress intended the term to be construed in
accordance with pre-existing regulatory interpretations.");
*Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir.

substantially limited in only the major life activity of working.[175]  With respect to the major life activity of working, federal regulations provide that the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and disabilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."[176]

_____

2002) ("The language in the ADA generally tracks the language set forth in the RA," and "[j]urisprudence interpreting either section is applicable to both.").  Because the parties have not identified any relevant differences between the statutes, nor objected to the validity of their implementing regulations, the Court too relies on both ADA and Rehabilitation Act precedent in resolving DHS's motion for summary judgment.  *See Toyota*, 534 U.S. at 193-94 ("Because both parties accept the EEOC regulations as reasonable, we assume without deciding that they are, and we have no occasion to decide what level of deference, if any, they are due."); *Sutton*, 527 U.S. at 479-480 (same); *Equal Empl. Opp. Comm'n v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 n.4 (5th Cir. 2009) (relying on ADA and Rehabilitation Act regulations when parties did not object to their validity).

[175]    "Moore grounds his 'regarded as' claim on the major life activity of working . . . ."  (R. 50 at 14.)

[176]    29 C.F.R. § 1630.2(j)(3)(I); *see also Toyota*, 534 U.S. at 200 ("[E]ven assuming that working is a major life activity, a claimant would be required to show an inability to work in a 'broad range of jobs,' rather than a specific job."); *Sutton*, 527 U.S. at 492 (same); *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993) (Under the Rehabilitation Act, "[a]n employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish *per se* that the

Moore has failed to demonstrate a genuine issue of material fact that USCG perceived his back condition as significantly restricting his ability to perform either a class of jobs or a broad range of jobs in various classes. The record indicates that USCG's perceptions of Moore's physical abilities were narrowly tailored to the specific duties of his job. Moore's notice of proposed termination asserts that Moore was physically unable "to fully perform the duties of [his] position," which was "dedicated to maintaining and repairing aids to navigation."[177] The notice contends that Moore was unable to perform the following specific elements of his position: electric horn repair; perform wave activated generator repair; perform 190MM lantern overhaul; perform range lantern repair; perform DCB 24" rotating beacon repair; handle and cut lumber for fabrication of dayboards repair; install large motors, 1/2 HP and over; assist with pouring concrete sinkers; carry moderately heavy equipment; travel by vessel; and operate various hand tools.[178] The notice also asserts that "*Your position* for example requires you to be able to lift moderately heavy equipment and climb towers. *Your*

employer regards the employee as having a substantial limitation on his ability to work in general.").

[177]    (Tab 47.)

[178]    (*Id.*)

47

*position* description recognizes that on any given day you would be required to lift over 15 pounds – continuously, throughout the day, which your doctor has restricted you from doing."[179]  These explanations for Moore's termination are limited to the narrow obligations of his position and do not suggest that USCG regarded Moore as unfit for a class of jobs or a broad range of jobs of various classes.  Moore has therefore failed to demonstrate a genuine issue of material fact that USCG regarded him as having a physical or mental impairment that substantially limited one or more of his major life activities.  DHS's motion for summary judgment is GRANTED as to Moore's claim under the Rehabilitation Act.

**IV.  CONCLUSION**

----

[179]    (*Id.* (emphasis added).)

For the reasons stated, DHS's motion to dismiss and/or motion for summary judgment is GRANTED IN PART and DENIED IN PART.

New Orleans, Louisiana, this 29th day of June, 2010.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE